

**FILED**

Jun 13 2017, 6:28 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Christopher G. Stevenson
William E. Winingham
Wilson Kehoe Winingham LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
MESSER CONSTRUCTION
COMPANY

Mark D. Gerth
Michael Wroblewski
Louis J. Britton
Kightlinger & Gray, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE PERI
FORMWORK SYSTEMS, INC.

Scott S. Morrisson
Blake P. Holler
Krieg DeVault LLP
Carmel, Indiana

Libby Yin Goodknight
Krieg DeVault LLP
Indianapolis, Indiana

Michael J. Halaiko
Jonathan A. Singer
Miles & Stockbridge, P.C.
Baltimore, Maryland

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Mark Gleaves,<br>*Appellant-Plaintiff,*<br><br>v.<br><br>Messer Construction Company and PERI Formwork Systems, Inc.,<br>*Appellees-Defendants* | June 13, 2017<br><br>Court of Appeals Case No. 49A02-1609-CT-2140<br><br>Appeal from the Marion Superior Court<br><br>The Honorable James A. Joven, Judge<br><br>Trial Court Cause No. 49D13-1211-CT-44519 |

**Baker, Judge.**

On October 9, 2012, Mark Gleaves, a construction worker employed by Whittenberg Construction ("Whittenberg"), was working at the construction site of the Indiana University Neuroscience Building when a sixteen-foot-long 2x4 lumber infill struck him in the head, inflicting serious injury. Whittenberg was a concrete contractor; Messer Construction Company ("Messer") was the construction manager of the construction project; and PERI Formwork Systems, Inc. ("PERI"), was the manufacturer of the formwork Whittenberg was using to form the walls of the building. Gleaves sued Messer, alleging that it had assumed a duty of reasonable care for his safety on the jobsite and that it breached that duty, and PERI, alleging that it failed to provide adequate warnings and instructions to end users and that it was not an open and obvious danger that lumber infills could eject during the removal process and strike a person standing a safe distance away. The trial court granted Messer's motion for summary judgment, finding that Messer did not owe a duty to Gleaves, and

PERI's motion for summary judgment, finding that because the hazard of this construction process is open and obvious, PERI did not have a duty to warn users about the dangers in the use of PERI forms. Gleaves now appeals. Finding no error, we affirm.

# Facts[1]

### *The Accident*

Messer contracted with Indiana University ("IU" or "Owner") for construction management services for the construction of the Neuroscience Building in Indianapolis. Whittenberg also contracted directly with IU to perform concrete work on the building. Whittenberg has performed concrete construction work using concrete formwork at more than one hundred jobsites, and it has used PERI-brand formwork in nearly all of its jobsites over the last fifteen years.

PERI manufactures and supplies formwork systems for concrete contractors' use in forming new concrete structures until the structures harden and become self-supporting. PERI manufactured and supplied the formwork system that Whittenberg used in this construction project. A PERI form is used to pour concrete walls; the system includes the use of infills to bridge gaps in the formwork. To set PERI forms, large panels are used first; progressively smaller

---

[1] We heard oral argument on Thursday, May 18, 2017, at the Monroe County Courthouse. We thank the Indiana State Bar Association for organizing the oral argument. We also thank counsel for their informative and engaging oral advocacy and subsequent discussion with the members of the bar association's Leadership Development Academy.

sized panels are then used until the gap is small enough to fill with a lumber infill. Whittenberg supplied the lumber and materials for the infills, and Whittenberg's carpenters made the infills on the construction site. PERI does not track the construction sites at which its forms are used; at this construction site, Whittenberg controlled the use of the PERI forms, including their location, installation, and removal.

[4] Gleaves's general duties at the construction site involved cleaning up after the carpenters, cleaning concrete forms, assisting with concrete pours, and retrieving discarded lumber infills used by Whittenberg. Gleaves had prior experience working on forming concrete walls, but he had not worked with PERI concrete forms before this construction project. When Gleaves began working on the construction project, Whittenberg had him watch a video about PERI forms. Whittenberg provided Gleaves with personal protection equipment, including a safety harness and a hard hat; it also held weekly and monthly safety meetings for its employees.

[5] On October 9, 2012, a crane was wrecking a section of formwork away from a concrete wall. "Wrecking" is a term of art in the concrete construction industry that involves the dismantling of the formwork used to form a concrete structure after the concrete has cured. Part of the wrecking process involved Whittenberg employees pushing to the ground unsecured lumber infills before removing the PERI forms with overhead cranes and taking them to another area.

Gleaves was working in a trench at the construction site patching tie holes in the concrete walls and picking up material in the trench. As the formwork was pulled up and away by the crane, a sixteen-foot 2x4 lumber infill was ejected from the form being lifted and struck Gleaves in the head while he was in the trench. No audible warning signal was given before the crane lifted the form that struck Gleaves. Prior to the accident, Gleaves did not see the crew above him wrecking the form that led to the accident.

### *The Contracts*

Under Messer's contract with IU, Messer's duties were owed to IU and not to any contractors or other third parties. The contract included the following provisions about safety at the construction site:

- Messer was to provide on-site administration of the construction contract.
- Messer was to use its best efforts to obtain satisfactory performance from each contractor, to recommend courses of action to IU when requirements of the construction contract were not being fulfilled, to determine that the work of each contractor was being performed according to the requirements of the construction contract, and to notify IU and the contractor of defects and deficiencies in the work.
- With respect to each contractor's own work, Messer did not have control over or charge of nor was responsible for construction means, methods, techniques, or safety precautions and programs in connection with the work of each contractor because these things were solely the contractor's responsibility under its contract.
- Messer did not have control over or charge of acts or omissions of the contractors or any other person performing work not directly employed by Messer.

- Messer was required to provide and maintain an effective safety program.  Each contractor was required to conform to Messer's Safety, Health and Environmental Program and its Safety4Site Program.
- Every worker was required to attend a safety orientation before working on the site.  The orientation was to take place in Messer's trailer.
- If a contractor did not re-erect a barricade or safety device after the completion of a work activity, Messer would perform the work.
- Upon notification of a safety deficiency, the contractor responsible was to use any and all means necessary to correct the situation immediately.  Messer could remove the contractor's employee or employees if they failed to address the situation.

Messer's App. Vol. II p. 11, 13, 16-17, 172.

[8]     The American Institute of Architects Document 232, which governed general conditions for construction, stated that Messer was to be responsible for the oversight of the health safety programs of the contractors; each contractor was to remain the controlling employer as to its employees and was to comply with the applicable safety laws; and Messer's responsibility for review of safety precautions did not extend to direct control over or charge of the acts or omissions of the contractors or their employees, nor did it constitute approval of safety precautions or any construction means, methods, or procedures.  The AIA Document A232 also provided that Whittenberg was responsible for initiating, maintaining, and supervising all safety precautions and programs connected with the performance of its contract.  *Id.* at 142.

[9]     The Messer Safety4Site program was established by Messer in order to reduce unsafe conditions that could cause accidents and applied to all contractors.  The Safety4Site program provided that:

- Each contractor was to conduct a meeting before every work shift to discuss the work to be done during the shift and to establish a safe plan of action to accomplish the work. All employees of the contractor were to attend.
- When there was a safety violation, Messer was to remove the contractor's employee from the site for the rest of the day.
- It was not Messer's intention to interfere in the contractor's relationship with its employees. Messer reserved the right to take immediate action to rectify unsafe situations and to direct an employee of a contractor to leave the site if the contractor's management personnel were not on site.
- Messer did not assume any responsibility to a contractor or its employees for supervising or monitoring the safety precautions. Messer did not assume any duty to detect and require correction of violations. Messer was allowed but not required to make periodic inspections of the construction site.
- Sanctions provided under Safety4Site for individuals and contractors are not exclusive and Messer reserved the right to pursue other remedies.

*Id.* at 155-57.

### *The Safety Instructions*

[10] PERI includes safety instructions in the assembly instruction manual that comes with the formwork. PERI's public website provides safety instructions and product information. Its safety instructions state that the operator must ensure that the instructions are available to the users, and that all workers who work with the product must be familiar with the safety instructions. The instructions advise that failing to adhere to assembly and safety instructions could lead to accidents; that the contractor has to provide safe working areas for employees and clearly mark and cordon off areas of risk; that all loose parts had to be removed or secured during the lifting and moving procedure; and that

contractors must not tear off the formwork panels with the crane. PERI's App. Vol. II p. 53-54, 70, 113.

[11] Whittenberg's 2012 Safety Organizational Plan governed its employees at the construction site. Its plan required employees to take precautions to prevent access to danger zones in which an overhead hazard was present. It provided that barricades must be used to prevent access into an unsafe area, such as where objects could fall from overhead; when overhead cranes were used, the swing radius must be marked or barricaded; employees must not stand under loads when feasible; and the crane operator must signal with the horn when he must fly a load over the heads of employees as a warning. *Id.* at 17, 23-24.

### *Procedural History*

[12] On November 16, 2012, Gleaves filed a complaint against Messer and PERI. On November 13, 2014, he filed a motion for partial summary judgment against Messer. On December 1, 2014, PERI filed a motion for summary judgment, arguing that it did not owe a duty to warn and that its product did not include lumber infills. On December 2, 2014, Messer filed a motion for summary judgment, arguing that it did not owe a duty to Gleaves.

[13] On March 5, 2015, a hearing took place during which all three parties presented argument. On August 26, 2016, the trial court granted summary judgment in favor of Messer and denied Gleaves's motion for partial summary judgment. On August 29, 2016, the trial court granted summary judgment in favor of PERI. Gleaves now appeals.

# Discussion and Decision

## I.    Standard of Review

Our standard of review on summary judgment is well established:

> We review summary judgment de novo, applying the same standard as the trial court: "Drawing all reasonable inferences in favor of . . . the non-moving parties, summary judgment is appropriate 'if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Williams v. Tharp,* 914 N.E.2d 756, 761 (Ind. 2009) (quoting T.R. 56(C )). "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences." *Id.* (internal citations omitted).

*Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014).

## II.  PERI

Gleaves alleges that PERI failed to provide adequate warnings and instructions to end users and that it was not an open and obvious danger that lumber infills could eject during removal and strike a person.  Specifically, Gleaves asserts that PERI knew that using excessive force to pry forms loose from poured concrete walls could lead to injury, but it failed to provide any instructions or warnings concerning the potential for loose pieces associated with its formwork system to eject out and cause injury.

Our Court has previously stated:

> When a defendant manufacturer in a negligence/products liability case moves for summary judgment, it has the burden to show the uncontroverted nonexistence of at least one of the elements essential to plaintiff's case. The reviewing court will affirm the grant of summary judgment on any legal basis supported by the designated evidentiary material. . . .
>
> Additionally, summary judgment is appropriately entered in favor of a defendant manufacturer on the affirmative defense of incurred risk where the evidence is without conflict and the sole inference to be drawn is that the plaintiff knew and appreciated the risk, but nevertheless accepted it voluntarily.

*Cole v. Lantis Corp.*, 714 N.E.2d 194, 198 (Ind. Ct. App. 1999). The question of whether a particular plaintiff's claim is barred under the open and obvious rule cannot always be resolved by the court as a matter of law. *Id.* at 199. When the facts or the reasonable inferences to be drawn therefrom are in conflict, the open and obvious nature of the danger is a question of fact for the jury. *Id.*

[17] In addition, our Court has adopted the following standard from the Seventh Circuit Court of Appeals:

> [w]hether a danger is open and obvious depends not just on what people can see with their eyes but also on what they know and believe about what they see. In particular, if people generally believe that there is a danger associated with the use of a product, but that there is a safe way to use it, any danger there may be in using the product in the way generally believed to be safe is not open and obvious.

*Id.* (citing *Corbin v. Coleco Indus., Inc.*, 748 F.2d 411, 417 (7th Cir. 1984)).

[18]     Gleaves goes to great lengths to argue that the lumber infills were part of PERI's product design because the infills were a necessary component of the formwork system and because PERI provided instructions for the use of lumber infills in its assembly instructions and referenced them in its parts catalog. Gleaves relies on *Progressive Insurance Co. v. General Motors Corp.*, 749 N.E.2d 484 (Ind. 2001), in which a vehicle owner sued a manufacturer for damage to the vehicle sustained when the vehicle caught fire. In discussing the production of vehicles, our Supreme Court noted that "it stretches ordinary usage to describe each component as a separate 'product' of the manufacturer who often assembles parts from various sources to produce its 'product.'" *Id.* at 490.

[19]     We find the present case easily distinguishable from *Progressive Insurance*, however, because unlike a car manufacturer that has contact with various parts of the vehicle during the production of the vehicle, even when the parts came from other sources, here, PERI had no connection to the lumber infills that were used at the construction site. Whittenberg supplied the lumber and materials for the infills, and Whittenberg employees made the infills. The mere fact that the lumber infill was used in conjunction with PERI's formwork does not mean that the infill was part of PERI's product or that PERI should be liable for any use or misuse of it.

[20]     Moreover, Gleaves, by his own admission, acknowledged that the danger and risk of being hit by a form during wrecking was open and obvious. During his deposition, Gleaves testified that he was aware that:

- PERI forms are dangerous if they fall because they could potentially fall on him;
- all wall forms must be lifted by a crane, which presents an overhead danger to people on the ground;
- all concrete forms are heavy and could fall on a person, whether the forms are on the ground or being lifted by a crane;
- if the lumber infill is going to be pushed off the wall, he should be out of the way;
- a lumber infill is something that can fall and be an overhead hazard;
- an unsecured wood form can fall;
- depending on the size and height of the wood form, the safe area would be far enough away that, no matter the size, if the form fell, it would not hit a person;
- the forms being wrecked at the time of the accident were approximately between 20-25 feet, and a safe zone would be more than 20-25 feet away; and
- he did not need anyone to tell him to get out of harm's way when wrecking work occurred, as he would leave the area when he knew such work was to occur.

PERI App. Vol. II p. 26-27, 29-30, 34-35, 38, 40. This testimony shows that Gleaves knew and understood the danger associated with the work he was doing, the potential for injury from any hazard formed during the wrecking process, and the need to move to a safe area when wrecking work was being performed. Accordingly, the trial court did not err in finding that the danger was open and obvious or in granting summary judgment for PERI.

# III. Messer

[21] Gleaves argues that the trial court erred in granting Messer's motion for summary judgment because Messer assumed a duty when it went beyond the

scope of its contract[2] and took specific controlling safety actions over the hazards that led to the accident.

[22] According to Gleaves, Messer assumed a duty when it required Whittenberg to sound an audible warning when lifting loads over or near other workers on the construction site; talked directly to Whittenberg's crane operators about flying loads over other workers; pulled Whittenberg's safety representative from an unsafe trench and sent him and other Whittenberg employees home for the day; sent workers home for three days after they were discovered working near an unsafe trench; and allowed Whittenberg to operate without the required full-time safety representative on the construction site.

[23] We find *Hunt Construction Group, Inc. v. Garrett*, 964 N.E.2d 222 (Ind. 2012), controlling in the present case. In *Hunt*, Hunt Construction Group, Inc., had entered into a contract with the Stadium Authority to act as the construction manager for the construction of a football stadium; Hunt did not have a contractual relationship with any other contractor on the project. *Id.* at 224. After an employee of another contractor was injured on the job and filed suit against Hunt, our Supreme Court found that Hunt did not owe the employee a legal duty of care either through its contractual obligations or through its

---

[2] We note that our Supreme Court recently decided a case in which the Court found that the general contractor of a construction project assumed a non-delegable duty of care related to worksite safety for the subcontractor's employees. *See Ryan v. TCI Architects/Engineers/Contractors, Inc.*, 72 N.E.3d 908 (Ind. 2017). We find *Ryan* easily distinguishable. In *Ryan*, the general contractor assumed a duty of care through its contractual obligations to the business entity that hired it; here, Gleaves does not argue that Messer's *contract* created a duty, but rather that Messer went *beyond* the scope of its contract to assume a duty.

actions or conduct. *Id.* at 229, 231. Our Supreme Court held "that for a construction manager not otherwise obligated by contract to provide jobsite safety to assume a legal duty of care for jobsite-employee safety, the construction manager must undertake specific supervisory responsibilities beyond those set forth in the original construction documents." *Id.* at 230.

[24] Similar to *Hunt*, Messer's actions regarding safety at the construction site fell within the scope of its contract with IU. Gleaves contends that Messer assumed a duty when it required Whittenberg to sound an audible warning when lifting loads at the construction site and when Messer employees talked directly to Whittenberg crane operators about not flying loads over other workers. Whittenberg's contract with IU stated that "[p]ersonnel shall be kept out from under any load being lifted." Messer's App. Vol. III p. 31. Gleaves testified that Whittenberg's rules required the crane operator to blow a horn before lifting heavy objects in order to warn others to move into a safe area out of the way. *Id.* at 67. Under Messer's contract with IU, Messer was responsible for the oversight of the safety programs of each contractor, allowed to make safety inspections and issue violations if work was being peformed in an unsafe manner, and enabled to take immediate action to fix unsafe situations. Therefore, any actions Messer took regarding the use or failure to use an audible warning to workers or to stop the crane operators from flying loads over other workers in order to maintain a safe construction site fell within its contractual obligations to IU.

[25] Next, Gleaves contends that Messer assumed a duty when on one occasion it pulled Whittenberg's safety representative from an unsafe trench and sent him and other workers home for the day and on another occasion sent workers home for three days when they were discovered working near an unsafe trench. Safety4Site provided that Messer could remove workers who were working in unsafe conditions from the construction site for the rest of the working day and the next working day if the violation occurred in the second half of the worker's shift. Messer's contract permitted it to modify its rules regarding personnel safety. Accordingly, Messer's actions were within the scope of its contractual obligations to IU.

[26] Gleaves further contends that Messer assumed a duty when it allowed Whittenberg to operate without the required full-time safety representative on the construction site. Whittenberg employed a full-time safety manager; its project manager served as the safety person in the safety manager's absence. Prior to Gleaves's accident, Whittenberg had indicated to Messer in an email that Whittenberg wanted to stop providing a full-time safety person at the construction site. Messer had agreed that, based on Whittenberg's performance, October 9, 2012, could be the last day that Whittenberg would need a full-time safety person at the construction site if Whittenberg resolved issues that Messer had observed, complied with its contracts, and corrected its safety concerns. Whittenberg's safety manager was present on October 9, 2012, the day of Gleaves's accident.

[27]     Moreover, Safety4Site provided that when a contractor had been issued two safety violations, the contractor was "required to provide a dedicated, competent safety person to the project to supervise" the daily meetings and work of the contractor and that the safety person must be at the construction site whenever the contractor was working until the contractor "has demonstrated to Messer's satisfaction that a significant improvement with [its] safety performance has occurred." Messer's App. Vol. II p. 156. Because Whittenberg had already received two safety violations, under Safety4Site, Messer's contract allowed it to require Whittenberg to provide a safety person at the construction site whenever Whittenberg was performing work until Messer determined that Whittenberg's safety performance had significantly improved. Therefore, Messer was acting within the scope of its contract when it considered allowing Whittenberg to stop providing a safety representative at the construction site.

[28]     Lastly, Gleaves contends that Messer assumed a duty through its general actions, including when Messer's project manager and safety manager walked through the construction site and observed safety conditions, and when Messer coordinated a safety orientation presentation for all workers. As for Messer's project and safety manager making observations through the construction site, Messer's contract required it to use its best efforts to obtain satisfactory performance from each contractor, to determine that the work of each contractor was being performed according to the requirements of the construction contract, and to notify a contract of defects and deficiencies.

Messer was to use its best efforts to obtain satisfactory performance from each contractor, to recommend courses of action to IU when requirements of the construction contract were not being fulfilled, to determine that the work of each contractor was being performed according to the requirements of the construction contract, and to notify IU and the contractor of defects and deficiencies in the work. Further, Safety4Site provided that Messer had the ability to make periodic inspections of the project site and would issue violations to contractors if warranted. Messer's actions fell within the scope of its contract and it did not assume a duty by undertaking them. As for the safety orientation presentation, Messer's contract stated that "each and every worker must attend a mandatory 1hr safety orientation session prior to starting work on site." *Id.* at 17. Messer was contractually obligated to perform this service and did not assume a duty by doing so.

[29] We acknowledge the tragic circumstances of this case, but to hold Messer liable for Gleaves's injury would create a perverse incentive for construction managers to refrain from taking a role in ensuring safe working conditions at construction sites. Messer's actions and conduct constituted its fulfillment of its contractual obligations to IU; Messer did not undertake supervisory responsibilities beyond those obligations, and it did not assume a duty to Gleaves through its actions or conduct. Therefore, the trial court did not err by granting summary judgment in Messer's favor.

The judgment of the trial court is affirmed.

Najam, J., and May, J., concur.